# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:23-CV-00280-RJC-SCR

| | |
|---|---|
| EASTERN WHOLESALE FENCE LLC,<br><br>        **Plaintiff,**<br><br>  v.<br><br>ADAM TUCKER AND SOUTHERN FENCE AND GATE, INC.,<br><br>        **Defendants.** | |

## MEMORANDUM AND RECOMMENDATION

**THIS MATTER** is before the Court on a Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim submitted by Defendants Adam Tucker and Southern Fence and Gate, Inc., ("Southern Fence") (Doc. No. 17) and the parties' briefs and exhibits (Doc. Nos. 18, 20 & 22).

The Motion has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and is ripe for disposition.

Having fully considered the arguments, the record, and the applicable authority, the undersigned respectfully recommends that Defendants' Motion to Dismiss for Failure to State a Claim be granted in part and denied in part, as discussed below.

    I.    **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Accepting the facts in Plaintiff's Complaint as true for the purposes of reviewing the Motion to Dismiss, Plaintiff Eastern Wholesale Fence LLC ("Plaintiff" or "Eastern Wholesale

Fence") is a "national wholesale distributor that supplies premium fence products to contractors and builders across the country." (Doc. No. 1 ¶ 15). HFS Supply, Inc., Hudson Vinyl Products, Inc., and Hudson Steel, Inc. (collectively, "HFS") was a fencing company that offered fencing and vinyl products "across the United States," and was believed to be the second largest domestic manufacturer of aluminum fencing. Id. ¶¶ 19-20, 23-24. HFS provided these products to several types of customers, including fence contractors, fence distributors, landscapers, builders, and end users. Id. ¶ 19. HFS operated a manufacturing facility in Fort Mill, South Carolina, as well as affiliated production locations in Albemarle and Locust, North Carolina. Id. ¶ 20.

In March 2021, Plaintiff and HFS entered into a purchase agreement, under which Plaintiff agreed to purchase the assets of HFS and its affiliates (the "Hudson Transaction"). Id. ¶ 21. Purchasing these assets allowed Plaintiff to manufacture aluminum fencing sections and vinyl fence materials. Id. ¶¶ 23-25. Plaintiff alleges that access to HFS's "strong customer base and distribution network of PVC fence customers" motivated its purchase of HFS. Id. ¶ 26.

Defendant Tucker ("Tucker") served as HFS's General Manager. Id. ¶ 27. As General Manager, Tucker received extensive confidential and proprietary information about HFS's operations. Id. ¶ 29. He also interacted with and maintained confidential business information about every client account served by HFS, and supervised manufacturing and production facilities. Id.

At the time of the Hudson Transaction, Tucker's half-brother was a selling shareholder. Id. ¶ 22. As part of the closing requirements for the Hudson Transaction, Tucker agreed, with advice of counsel, to execute an employment agreement (the "Employment Agreement") with Plaintiff, which contained non-competition and non-solicitation covenants for two years. Id. ¶¶ 3, 28, 39-40, 43, 45; (Doc. No. 1-1 at 9-11). Specifically, the Employment Agreement included the

following non-competition restrictions:

> [Tucker] shall not, directly or indirectly, own any interest in, manage, control, participate in (whether as an officer, director, manager, employee, salesman, consultant, partner, equity holder, member, agent, representative or otherwise), consult with, render services for, or in any other manner engage in any business engaged directly or indirectly, in any country, territory, province or state in which [Plaintiff] or any of its Subsidiaries operate or provide services or products (including by contracting with customers or suppliers, delivering products or performing service and support activities), in the business of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates as currently conducted or as will be conducted during the Restricted Period (including, without limitation, the business of (a) operating or providing services or products related to the manufacture, remanufacture, fabrication, distribution, sale, resale, trade, extruding, or brokerage of fencing, railing or related products, or (b) operating or providing services or products that are developed, marketed, sold, or provided, or planned to be developed, marketed, sold, or provided, by [Plaintiff] or any of its Subsidiaries), or any other business that is competitive to, or provides services similar to those of, [Plaintiff] or any of its Subsidiaries; provided, however, that a minority ownership interest of not more than 5% of the outstanding equity of a publicly traded company's common stock shall not be deemed a violation of this Section 7(b).

(Doc. Nos. 1 ¶ 43 & 1-1 at 10 ¶ 7(b)).

The Employment Agreement also included the following non-solicitation restrictions:

> [Tucker] shall not directly or indirectly through another Person, (i) induce or attempt to induce any employee, independent contractor, officer, manager or director of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates to leave the employ or services of such Person, or in any way interfere with the relationship between [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates and any employee, independent contractor, officer, manager or director thereof, (ii) hire any Person who was an employee, officer, manager or director, or engage any independent contractor, of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates at any time during the Employment Period or during the twelve (12) month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the parties so as to avoid any disputes under this Section 7(c) that any such hiring within such twelve (12) month period is in violation of clause (i) above) or (iii) induce or attempt to induce or call on, solicit or service any current or former customer, supplier, licensee, licensor, independent contractor, franchisee, consultant or other business relation of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates or in any way interfere with the relationship between any such customer, supplier, licensee, licensor, franchisee, consultant or business relation of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates.

(Doc. Nos. 1 ¶ 45 & 1-1 at 11 ¶ 7(c)).

The Employment Agreement also purported that the non-competition and non-solicitation provisions were severable:

> If, at the time of enforcement of the covenants contained in this Section 7 (the "Restrictive Covenants"), a court shall hold that the duration, scope or area restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope or area reasonable under such circumstances shall be substituted for the stated duration, scope or area and that the court shall be allowed and directed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by law. [Tucker] has consulted with legal counsel regarding the Restrictive Covenants and based on such consultation has determined and hereby acknowledges that the Restrictive Covenants are reasonable in terms of duration, scope and area restrictions and are necessary to protect the goodwill of [Plaintiff], its Subsidiaries and Affiliates.

(Doc. No. 1-1 at 11 ¶ 7(e)).

Finally, the Employment Agreement included a choice-of-law provision indicating that "[a]ll issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of South Carolina." (Doc. No. 1-1 at 14 ¶ 19). The Employment Agreement was dated March 26, 2021, and includes the signatures of Brent Willson, Plaintiff's Vice President, and Tucker. (Doc. No. 1-1 at 2, 17-18).

In exchange, Plaintiff agreed to hire Tucker as a general manager, with an "improved compensation package" including bonus opportunities, cash and equity incentives, and certain severance rights. (Doc. Nos. 1 ¶¶ 28, 41-42, 76 & 1-1). On March 26, 2021, Tucker began serving as the general manager of Plaintiff's newly acquired operations. Id. ¶¶ 2, 39. In this role, Tucker continued to have access to confidential data and client goodwill that was previously purchased by Plaintiff, but Tucker also gained confidential business information used in Plaintiff's Northeast operations along with detailed engineering and business plans. Id. ¶¶ 30-31, 36, 38. Tucker was one of only a few individuals with access to a database that tracked all client account projects being manufactured and managed from the Fort Mill facility. Id. ¶ 35. Tucker worked for Plaintiff until

July 20, 2021, when he resigned. Id. ¶ 52. Tucker told Plaintiff upon resignation that he was going to pursue a business of manufacturing and selling gate access controls under Tucker Access Controls, LLC ("TAC"). Id. ¶ 53. Plaintiff took no issue with Tucker's proposed business because Plaintiff does not manufacture or sell gate access controls. Id. ¶ 54. In fact, Plaintiff financially supported Tucker in this new endeavor by supplying Tucker with "over $45,000 in materials." Id.; (Doc. No. 1-2).

However, ten months after Tucker's resignation, on or about May 16, 2022, Plaintiff allegedly received a misaddressed invoice for a fence manufacturing component directed to Tucker, and Plaintiff then learned Tucker worked for a competing business in the same marketplace. (Doc. No. 1 ¶¶ 4-5, 56). According to Plaintiff, Tucker formed Southern Fence on October 17, 2022, and presently continues to serve as Southern Fence's Executive Director. Id. ¶ 57. Plaintiff alleges that Defendants "sought to duplicate the very business HFS sold to Plaintiff." Id. ¶ 58. Plaintiff asserts that Southern Fence "manufactures and distributes fencing to the Charlotte, North Carolina-area fence retailers, and contractors." Id. ¶ 57. Additionally, Plaintiff maintains that Southern Fence operates out of the former HFS facility in Albemarle. Id. ¶ 58.

On April 6, 2023, Plaintiff wrote to Tucker, "demanding that Defendants immediately cease any unlawful conduct to avoid litigation." Id. ¶ 61. Defendants responded to this letter indicating that they would not cease and desist. Id. ¶ 62.

Thereafter, on May 12, 2023, Plaintiff commenced this action against Defendants. (Doc. No. 1). Plaintiff's Complaint alleges that after resigning from Plaintiff's employment, Tucker failed to honor the non-competition and non-solicitation provisions of the Employment Agreement. Id. ¶¶ 78-80, 88. In its Complaint, Plaintiff asserts three claims: (1) breach of contract of a non-competition covenant against Tucker, id. ¶¶ 73-82; (2) breach of contract of a non-solicitation covenant against Tucker, id. ¶¶ 83-92; and (3) tortious interference with contract

against Southern Fence, id. ¶¶ 93-100.  Plaintiff seeks declaratory relief and damages, including for lost profits and business relationships with former HFS customers because of Defendants' conduct.  Id. ¶¶ 63, 65.  Defendants filed a Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim, which is now before the Court.  (Doc. No. 17).

## II. DISCUSSION

### A. Standard of Review

In reviewing a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).  The plaintiffs' "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Id. at 563.  A complaint attacked by a Rule 12(b)(6) motion to dismiss will survive if it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

In Iqbal, the Supreme Court articulated a two-step process for determining whether a complaint meets this plausibility standard.  Id. at 678-79.  First, the court identifies allegations that, because they are no more than conclusions, are not entitled to the assumption of truth.  Id. at 679.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555).  Although the pleading requirements stated in Rule 8 of the Federal Rules of Civil Procedure mark "a notable and generous

departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678-79.

Second, to the extent there are well-pleaded factual allegations, the court assumes their truth and then determines whether they plausibly give rise to an entitlement to relief. Id. "Determining whether a complaint contains sufficient facts to state a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'– 'that the pleader is entitled to relief,'" and therefore should be dismissed. Id. (quoting Fed. R. Civ. P. 8(a)(2)).

The sufficiency of the factual allegations aside, "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." Neitzke v. Williams, 490 U.S. 319, 326 (1989). Indeed, where "it is clear that no relief could be granted under any set of facts that could be prove[n] consistent with the allegations . . . a claim must be dismissed." Id. at 327 (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

### B. Breach of the Non-competition and Non-solicitation Covenants

As an initial matter, the parties do not dispute that South Carolina law governs the Employment Agreement based on a choice of law provision. (Doc. Nos. 1 ¶ 19; 1-1; 18 at 1; 20 at 4). Under South Carolina law for a breach of contract claim, Plaintiff must sufficiently state facts to support the following: (1) a binding contract entered into by the parties; (2) a breach or unjustifiable failure to perform the contract; and (3) damages suffered by the plaintiff as a direct and proximate result of the breach. Prysmian Cable & Sys. USA, LLC v. Szymanski, 573 F. Supp. 3d 1021, 1036 (D.S.C. 2021) (citing Fuller v. E. Fire & Cas. Ins. Co., 124 S.E.2d 602, 610 (S.C. 1962)).

*Non-Competition Covenant*

Courts "generally disfavor" non-compete covenants and strictly construe them against the employer. Rental Unif. Serv. of Florence, Inc. v. Dudley, 301 S.E.2d 142, 143 (S.C. 1983). This is because courts are equally concerned with "the right of a person to use his talents to earn a living" and "the legitimate interest of a business in protecting its clientele and goodwill." Fay v. Total Quality Logistics, LLC, 799 S.E.2d 318, 322-23 (S.C. Ct. App. 2017) (quoting Baugh v. Columbia Heart Clinic, P.A., 738 S.E.2d 480, 486 (S.C. Ct. App. 2013)). Such covenants may be upheld if it is: "(1) necessary for the protection of the legitimate interest of the employer; (2) reasonably limited in its operation with respect to time and place; (3) not unduly harsh and oppressive in curtailing the legitimate efforts of the employee to earn a livelihood; (4) reasonable from the standpoint of sound public policy; and (5) supported by valuable consideration." Milliken & Co. v. Morin, 685 S.E.2d 828, 833 (S.C. Ct. App. 2009); Faces Boutique, Ltd. v. Gibbs, 455 S.E.2d 707, 708 (S.C. Ct. App. 1995). An analysis of a non-compete covenant requires an assessment of the parties' businesses, markets, protectable interests, and whether the covenant matches those interests. Chapman v. Blue Cross Blue Shield of S.C., No. 3:15-cv-710-TLW, 2015 WL 13158310 (D.S.C. July 28, 2015). A covenant not to compete may be unenforceable when it is not reasonably limited as to time and territory. Poole v. Incentives Unlimited, Inc., 548 S.E. 2d 207, 209 (2001).

Defendant Tucker urges dismissal of the breach of contract claims on the basis that the non-compete is unenforceable under South Carolina law. (Doc. No. 18 at 6-8). Tucker argues that the non-compete is unreasonable in scope, is "duly harsh and oppressive," and violates "public policy," and that it is not necessary for the protection of the legitimate interests of the employer, among other things. Id. at 5-15. Plaintiff responds that Defendant's motion is premature at this pleadings stage. The undersigned agrees with Plaintiff.

Here, Plaintiff has sufficiently alleged a breach of contract claim of the non-compete covenant. Plaintiff has alleged that "concurrently with and in connection with the purchase of HFS, Tucker commenced employment with Plaintiff and executed a binding Employment Agreement (the 'Employment Agreement') with Plaintiff that was contingent on the Hudson Transaction's ultimate consummation." (Doc. No. 1. ¶¶ 39, 74-75). Further, "[a]s part of the closing requirements for the Hudson Transaction, Tucker agreed to execute an employment agreement containing certain restrictive covenants," including a two year non-compete covenant with the benefit of "experienced counsel." Id. ¶¶ 28, 40. The non-compete covenant stated that:

> [Tucker] shall not, directly or indirectly, own any interest in, manage, control, participate in (whether as an officer, director, manager, employee, salesman, consultant, partner, equity holder, member, agent, representative or otherwise), consult with, render services for, or in any other manner engage in any business engaged directly or indirectly, in any country, territory, province or state in which [Plaintiff] or any of its Subsidiaries operate or provide services or products (including by contracting with customers or suppliers, delivering products or performing service and support activities), in the business of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates as currently conducted or as will be conducted during the Restricted Period (including, without limitation, the business of (a) operating or providing services or products related to the manufacture, remanufacture, fabrication, distribution, sale, resale, trade, extruding, or brokerage of fencing, railing or related products, or (b) operating or providing services or products that are developed, marketed, sold, or provided, or planned to be developed, marketed, sold, or provided, by [Plaintiff] or any of its Subsidiaries), or any other business that is competitive to, or provides services similar to those of, [Plaintiff] or any of its Subsidiaries; provided, however, that a minority ownership interest of not more than 5% of the outstanding equity of a publicly traded company's common stock shall not be deemed a violation of this Section 7(b).

(Doc. Nos. 1 ¶ 43 & 1-1 at 10 ¶ 7(b)).

Plaintiff alleges that in exchange Tucker received valuable consideration, including "substantial payments in the form of salary, bonus and longer-term profits-driven incentives." (Doc. No. 1 ¶¶ 76-77). Plaintiff pleads that the restrictive covenants are narrowly drawn, limited to a reasonable duration, line of business, and geographic scope, and are necessary to protect Plaintiff's competitive business interests. Id. at ¶ 79. Plaintiff asserts that Defendant breached the

non-compete covenant "by surreptitiously forming a competing business in the same geographic market where Plaintiff hired Defendant Tucker through the Hudson Transaction and where Plaintiff acquired the assets of HFS." Id. at ¶ 80. Plaintiff further alleges that Tucker's breach caused Plaintiff to suffer substantial damages, including loss of clients, confidential and proprietary information, goodwill and reputation, and competitive advantage. Id. at ¶¶ 4-7, 81-82. Based on these allegations, the undersigned finds Plaintiff has sufficiently stated a claim.

Despite these factual allegations, Defendant still seeks dismissal arguing that the covenant is unreasonable[1] and unenforceable under South Carolina law. But Defendant's argument is premature. There is further factual development needed before evaluating Defendant's claims as to the enforceability of the non-compete covenant. See Chapman, 2015 WL 13158310, at *1-3 (rejecting similar argument that a non-compete clause is unenforceable as "premature" and "further factual development is needed before a determination as to the validity of the [n]on-[c]ompete [c]lause can be made."); LPS Servs, Inc. v. Pivot Parking, LLC, 6:21-cv-00532-JD, 2021 WL 5991057 (D.S.C. Aug. 23, 2021) (similarly denying motion to dismiss despite defendant's arguments as to unenforceability); Industrial Packaging Supplies, Inc., v. Davidson, C/A No. 6:18-0651-TMC, 2018 WL 10456201 (D.S.C. June 22, 2018) (same).

For example, the parties have differing versions of Tucker's role in the sale of HFS. Plaintiff alleges that Tucker's half-brother was a selling shareholder in the transaction and that Tucker was a General Manager. (Doc. No. 20 at 3). As such, Plaintiff argues Tucker was intertwined in the sale of the business and was required to sign a non-compete as a condition of the Hudson Transaction closing. Id. at 3, 7. Meanwhile, Tucker argues that he did not receive any

---

[1] The undersigned observes one of the main cases cited by Defendant to support its argument that the covenant "is not reasonably limited in its operation with respect to place" was decided at the summary judgment stage and still reversed and remanded for further development of the facts in order to clarify application of the law. See Team IA, Inc. v. Lucas, 717 S.E.2d 103, 108 (S.C. Ct. App. 2011).

consideration or benefit from the Hudson Transaction because he was only an employee. (Doc. No. 22 at 2). The Parties then argue about whether a more relaxed standard for evaluating a non-compete covenant applies when the covenant is entered into in conjunction with the sale of a business. See Palmetto Mortuary Transp., Inc. v. Knight Sys., Inc., 818 S.E.2d 724, 731 (S.C. 2018) (explaining that "a non-compete covenant entered into in conjunction with the sale of a business and its good will is valid if: (1) supported by valuable consideration, (2) reasonably limited as to time, and (3) reasonably restricted as to the place of territory."). The South Carolina Supreme Court in Palmetto described the reason for this different standard:

> Non-compete covenants executed in conjunction with the sale of a business should be scrutinized at a more relaxed level than non-compete covenants executed in conjunction with employment contracts. . . . Non-compete covenants executed in the context of an employment contract are generally disfavored and are strictly construed against an employer. Milliken, 399 S.C. at 31, 731 S.E.2d at 292. The probability of unequal bargaining power that may exist between an employer and employee is significantly reduced when the restriction arises in the context of a sale of a business between two sophisticated parties. Also, a non-compete covenant executed pursuant to the sale of a business allows the opportunity for a seller to capitalize on the disposition of the business's goodwill and bargain for a higher price.

Id. at 731. The court further noted that "an analysis of the reasonableness of a territorial restriction in a non-compete covenant must take into account relevant facts surrounding the making of the agreement." Id. The fact that the parties are arguing over the underlying circumstances giving rise to standard highlights why this issue should not be decided at the motion to dismiss stage.[2]

Defendant's own brief highlights the need for a fuller record stating that "Plaintiff implies that the Noncompetition Covenant is somehow tethered to Tucker's specific responsibilities with Plaintiff" but then argues that "no such limitations or relationship to Tucker's actual job duties are

---

[2] To be clear, the undersigned is not making a recommendation on whether the more relaxed standard applies or is even available to this case because factual development is needed that may impact the Court's analysis. Regardless, the undersigned still finds that Plaintiff has sufficiently stated a claim that survives a motion to dismiss under either standard.

present in the wording of the Employment Agreement itself." (Doc. No. 22 at 8). But at this early stage, there is not yet a full record of Tucker's specific responsibilities and the areas covered by Tucker. Defendant further argues that the scope of the non-compete was so overly broad it must be unenforceable and cites several examples and hypotheticals that Defendant might even be prohibited from working in any capacity for any number of entities. Meanwhile, taking Plaintiff's allegations as true for the purposes of this Motion to Dismiss, Plaintiff alleges that they did not take issue with Tucker opening up his originally proposed business of selling gate access controls because Plaintiff does not manufacture or sell such products and even financially supported Tucker to start this business by supplying Tucker with "over $45,000 in materials." (Doc. No. 1 ¶ 54; Doc. No. 1-2).

Even if Defendant's arguments have merit, it would be improper for this Court to engage in factual back and forth at this early stage. For these reasons, the undersigned respectfully recommends that Defendants' Motion to Dismiss Plaintiff's Breach of Contract as to the non-compete covenant be <u>denied</u>.

*Non-solicitation Covenant*

Non-solicitation covenants are generally subject to the same requirements and strict analysis as covenants not to compete. <u>See</u> <u>Nucor Corp. v. Bell</u>, 482 F. Supp. 2d 714, 729-30 (D.S.C. 2007); <u>Rockford Mfg., Ltd. v. Bennet</u>, 296 F. Supp. 2d 681 (D.S.C. 2003); <u>Fournil v. Turbeville Ins. Agency, Inc.</u>, No. CV 3:07-3836-JFA-PJG, 2008 WL 11349821, at *2 (D.S.C. Dec. 30, 2008), <u>report and recommendation adopted</u>, 2009 WL 512261 (D.S.C. Mar. 2, 2009). A non-solicitation covenant "must be reasonably limited with respect to time and place, but an otherwise reasonable limitation on the solicitation of former clients can substitute for a territory restriction." <u>Baugh</u>, 738 S.E.2d at 486 (internal citations omitted); <u>see</u> <u>Wolf v. Colonial Life & Accident Ins. Co.</u>, 420 S.E.2d 217, 220 (S.C. Ct. App. 1992) (affirming the validity of a similar prohibition

because it "prohibit[ed] only the unfair competition of contacting [the employer's] existing customer and using the information and training provided to [the former employee by the employer] to 'pirate' the customers").

Here, the non-solicitation covenant stated that:

> [Tucker] shall not directly or indirectly through another Person, (i) induce or attempt to induce any employee, independent contractor, officer, manager or director of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates to leave the employ or services of such Person, or in any way interfere with the relationship between [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates and any employee, independent contractor, officer, manager or director thereof, (ii) hire any Person who was an employee, officer, manager or director, or engage any independent contractor, of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates at any time during the Employment Period or during the twelve (12) month period immediately prior to the date on which such hiring would take place (it being conclusively presumed by the parties so as to avoid any disputes under this Section 7(c) that any such hiring within such twelve (12) month period is in violation of clause (i) above) or (iii) induce or attempt to induce or call on, solicit or service any current or former customer, supplier, licensee, licensor, independent contractor, franchisee, consultant or other business relation of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates or in any way interfere with the relationship between any such customer, supplier, licensee, licensor, franchisee, consultant or business relation of [Plaintiff] or any of its Subsidiaries or any of their respective Affiliates.

(Doc. Nos. 1 ¶ 45 & 1-1 at 11 ¶ 7(c)).

Plaintiff does not allege in its claim that Tucker violated the covenant with respect to recruitment of other employees. (Doc. No. 1). Rather, Plaintiff's claim is centered around Tucker's alleged violation of the covenant by soliciting and servicing current or former customers. Id. ¶¶ 5, 60, 65, 83-92. Having reviewed all of the allegations in the Complaint, the undersigned finds that Plaintiff has sufficiently stated a claim for breach of the non-solicitation covenant. Plaintiff goes into great detail concerning the alleged breach: that Tucker, through Southern Fence, is utilizing the same Albemarle site once used by HFS to sell the exact same materials and styles of fencing as sold by Plaintiff and is "marketing and selling those products to Plaintiff's customers." Id. ¶¶ 58-60. Plaintiff claims to have personally observed fencing sections and

similar materials being shipped from the Albemarle site, and that Tucker met or interacted with prior customer in violation of the non-solicitation clause. Id. ¶ 58. Plaintiff pleads that it has suffered damages as a result of Tucker's breach. Id. ¶¶ 91-92. Plaintiff also asserts that the restrictive covenants are enforceable and narrowly drawn in scope as necessary to protect Plaintiff's business interests. Id. ¶ 89.

Despite these detailed allegations, Defendant seeks dismissal arguing that the covenant is not narrowly tailored for the reasonable protection of Plaintiff's business interests. Once again, Defendant's arguments are premature. Defendant claims "Tucker has no way of even knowing the identity of all of the customers" or "other business relation[s]" of Plaintiff. (Doc. No. 18 at 14-15). Meanwhile, Plaintiff has alleged that Tucker "possessed a complete floor to ceiling knowledge of Plaintiff's business [including] the larger distribution channels that HFS had developed throughout the United States for the sales of aluminum fencing." (Doc. No. 1 ¶ 38). Plaintiff also includes factual allegations that Tucker was one of only a few individuals with access to a database that tracked all client account projects being manufactured and managed from the Fort Mill facility. Id. ¶ 35. Considering this, there is additional factual development needed prior to the Court making any ruling on the enforceability, including whether the covenant is narrowly tailored to protect Plaintiff's business interests. As a result, the undersigned respectfully recommends that Defendants' Motion to Dismiss Plaintiff's Breach of Contract as to the non-solicitation covenant be denied.

C. **Tortious Interference Claim**

"A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules." Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc., 386 F.3d 581, 599-600 (4th Cir. 2004) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496

(1941)).  "Lex loci delicti is the North Carolina choice-of-law rule for most tort claims."  Worley Claims Servs., LLC v. Jefferies, 429 F. Supp. 3d 146, 157 (W.D.N.C. 2019) (citing Boudreau v. Baughman, 368 S.E.2d 849, 853-54 (N.C. 1988)).  Lex loci means "the law of the situs of the claim," which is the law of "the state where the injury occurred."  Boudreau, 368 S.E.2d at 853. Although South Carolina law applies to the Employment Agreement, Plaintiff alleges that Southern Fence's tortious interference with the Employment Agreement occurred in North Carolina.  (Doc. No. 1 ¶ 65).  The Parties have briefed this issue citing to North Carolina law, and the undersigned has reviewed the allegations and agrees that North Carolina law applies.

Under North Carolina law, to state a claim of a tortious interference with contract, a Plaintiff must plausibly allege:

> (1) a valid contract between the Plaintiff and a third person, conferring upon the Plaintiff some contractual right against the third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract with the Plaintiff; (4) the defendant acted without justification; and (5) Plaintiff suffered actual damages.[3]

United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 387 (N.C. 1988); Peoples Sec. Life Ins. Co. v. Hooks, 367 S.E.2d 647, 649-50 (N.C. 1988); Benjamin v. Sparks, 173 F. Supp. 3d 272, 289 (E.D.N.C. 2016) (citing United Labs., Inc., 370 S.E.2d at 387)); Giuliani v. Duke Univ., No. 1:08-CV-502, 2009 WL 1408869, at *4 (M.D.N.C. May 19, 2009) (internal citations omitted).

Defendant Southern Fence argues that no valid contract exists between Plaintiff and Tucker, and thus, no tortious interference claim can be brought against Defendant Southern Fence. "There can be no claim for tortious interference when there is no contract."  Prometheus Grp. Enters, LLC v. Gibson, No. 22-CVS-14236, 2023 WL 2589284, at *10 (N.C. Super. Ct. Mar. 21,

---

[3] In an abundance of caution, the undersigned notes that the elements of a tortious interference with contract claim in South Carolina are nearly identical.  Love v. Gamble, 448 S.E.2d 876, 882 (S.C. Ct. App. 1994); Dutch Fork Dev. Group II, LLC v. SEL Properties, LLC, 753 S.E.2d 840, 844 (S.C. 2012) (citing Camp v. Springs Mortgage Corp., 426 S.E.2d 304, 305 (S.C. 1993).  Further, as previously noted, whether the Employment Agreement is valid and enforceable is a question of South Carolina law, which the parties do not dispute.

2023). As outlined in this Memorandum and Recommendation, the undersigned finds that Plaintiff has sufficiently alleged the breach of the restrictive covenants at this stage. As a result, Plaintiff also has sufficiently alleged the existence of a valid contract for this claim.

It is, however, Plaintiff's lack of pleading the fourth element "the defendant acted without justification" that requires dismissal of the claim. The undersigned has closely reviewed Plaintiff's Complaint and notes the word "justification," or any variation of that word, does not appear in the Complaint. This is a key issue for this claim as Defendant Southern Fence argues they were justified in any conduct based on competition. But, the Court cannot address this argument now because Plaintiff has simply failed to plead that Defendant Southern Fence acted without justification.[4] For this reason, the undersigned respectfully recommends that Defendants' Motion to Dismiss be <u>granted</u> as to the tortious interference claim.

### III. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Defendants' Motion to Dismiss for Failure to State a Claim be **DENIED IN PART AND GRANTED IN PART.** Specifically, the undersigned recommends that the Motion be **DENIED** as to the Breach of the Non-Competition Covenant and the Non-Solicitation Covenant claims and

---

[4] Given that Plaintiff failed to allege that Defendant acted without justification, the undersigned need not address the remaining elements. The undersigned further notes that Plaintiff, in its argument related to competition, wrongly suggests that a case supporting their position as being from the Western District of North Carolina, when it is from the Middle District of North Carolina. (Doc. No. 20 at 19); <u>see</u> <u>BioSignia, Inc. v. Life Line Screening of Am., Ltd.</u>, No. 1:12CV1129, 2014 WL 2968139, at *1 (M.D.N.C. July 1, 2014). The Court will give Plaintiff the benefit of the doubt that this was a scrivener's error, but in the future, counsel must take caution in properly citing any authority. The undersigned also observes that another case cited by Plaintiff from the District Judge assigned to this case previously found in <u>Nat'l Welders Supply Co.</u> that allegations of secretive conduct and inducement of employees to breach their contracts reflected "something more than fair competition" and denied the motion to dismiss as to a tortious interference claim. (Doc. No. 20 at 20); <u>Nat'l Welders Supply Co. v. Roberts Oxygen Co.</u>, No. 3:07-CV-350, 2008 WL 1837251, at *2 (W.D.N.C. Apr. 22, 2008) (Conrad, D.J.). The undersigned agrees that Plaintiff has correctly cited its holding, but observes that in that case, the plaintiff's complaint contained a specific paragraph alleging the defendants acted without justification. <u>Nat'l Welders Supply Co. v. Roberts Oxygen Co.</u>, No. 3:07-CV-350, (Doc. No. 1-2 ¶ 49) ("Defendants acted without justification in interfering with these contracts."). No such allegation appears in Plaintiff's instant Complaint and, thus, renders the tortious interference claim defective. (Doc. No. 1).

**GRANTED** as to the Tortious Interference Claim and that such claim be **DISMISSED WITHOUT PREJUDICE.**

### IV. TIME FOR OBJECTIONS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained in this Memorandum must be filed within fourteen days after service of same. Failure to file objections to this Memorandum with the Court constitutes a waiver of the right to de novo review by the District Judge. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315-16 (4th Cir. 2005). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Id. "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

The Clerk is directed to send copies of this Memorandum and Recommendation to the parties' counsel, and the Honorable Judge Robert J. Conrad, Jr.

**SO RECOMMENDED**.

Signed: January 31, 2024

Susan C. Rodriguez
United States Magistrate Judge